Dwane M. Cates (SBN: 017964)
**DWANECATES.COM, PLLC**
7310 N. 16th Street, Suite 330A
Phoenix AZ 85020
Telephone: 480 620 8568
dwane@dwanecates.com

Attorney for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| **United States of America**, | Docket No. CR-20-00627-PHX-DGC |
| Plaintiff, | **DEFENDANT SENTENCING MEMORANDUM** |
| vs | |
| Holdinn Anthony DiCamillo | |
| Defendant. | (Before the Honorable Douglas G. Cambell) |

Defendant Holdinn Anthony DiCamillo, by and through undersigned counsel, hereby submits this Sentencing Memorandum in advance of the Sentencing currently set for October 12th, 2022, before the Honorable Douglas G. Cambell.  This Sentencing Memorandum is more fully set forth in the attached Memorandum of Points and Authorities.

RESEPCTFULLY SUBMITTED this 2nd day of October, 2022.

DwaneCates,Com PLLC


_____/s/ Dwane Cates_____
Dwane Cates
7310 N. 16th Street, Suite 330A
Phoenix, AZ 85020
Attorney for Defendant

///
///

## MEMORANDUM OF POINTS AND AUTHORITIES

### *FACTUAL BACKGROUND*

On October 13th, 2020, a 14-count indictment was filed in U.S. District Court, District of Arizona.  On November 3rd, 2020, DiCamillo was arrested on a warrant issued in this offense in the Southern District of California and temporarily ordered detained. On November 23rd, 2020, Dicamillo was transferred to the District of Arizona where he was ordered released on his own recognizance under the supervision of U.S. Pretrial Services.  On February 22nd, 2022, Dicamillo pleaded guilty to Count 10 of the indictment and entered into a written plea agreement.  He is scheduled to be sentenced by this court on October 12th, 2022.

### *LEGAL ARGUMENT*

In light of the Supreme Court's holding in United States v. Booker, 543 U.S. 220 (2005), the Sixth Amendment permits the sentencing court to give consideration to the federal Sentencing Guidelines (the "Guidelines"), but the District Court may tailor the sentence upward or downward in light of other statutory concerns because the Guidelines are merely advisory. Kimbrough v. United States, 552 U.S. 85, 101, 128 S. Ct. 558, 570 (2007).  In Kimbrough, it was held that the District Court did not abuse its discretion by imposing a sentence below the Guidelines because the Guidelines' sentence yielded a sentence "greater than necessary" to achieve the sentencing statute's purposes.  Id. at 110-11, 128 S. Ct. at 575. Further, under Kimbrough, it is enough that the district court considers the Guidelines, addresses the relevant statutory factors, and then imposes a "reasonable" sentence, even if that sentence is lower than the Guidelines' recommendations.  Id.  In short, the Guidelines are to be considered, but there is no rule requiring that "extraordinary" circumstances are found to justify a sentence that falls outside of the Guidelines.  Gall v. United States, 552 U.S. 38 (2007).

2

Under current law, sentences outside of the Guidelines are reviewed only under the deferential standard of abuse of discretion and "reasonableness." Id. (citing Booker, 543 U.S. at 225). A sentencing judge has discretion in the sentencing option. There is a limitation to the imposition of a term of imprisonment in that it may not be used to promote correction and rehabilitation 18 U.S.C. § 3582(a). However, Booker and § 3553(a) make clear that courts are no longer to strictly apply the Guidelines as its means of sentencing.  See United States v. Ameline, 400 F.3d 646, 655-56 (9th Cir. 2005) (Guidelines are only one of the factors that a judge must consider in determining the appropriate sentence). In fact, the sentence may be held erroneous if the judge applies the Guidelines as mandatory, or if the judge presumes that a particular sentence within the range is reasonable without considering the other factors.  United States v. Carty, 520 F.3d 984, 991-92 (9th Cir. 2008).

The Court should begin all sentencing proceedings by calculating the applicable Guidelines.  Next, the Court should give both parties an opportunity to argue for whatever sentence they deem appropriate after considering all of the statutory factors found in 18 U.S.C. § 3553(a) to determine if they support the sentence. Gall, 552 U.S. at 49-50; see also United States v. Carty, 520 F.3d 984, 991-92 (9th Cir. 2008).  The judge must make an individualized assessment based on the facts presented and the totality of the circumstances.  Id. Lastly, the District Court must explain the appropriateness of an unusually lenient or harsh sentence with the sufficient justifications and the Appellate Court will review the sentence under the deferential "abuse of discretion" standard.  Id.

///

///

## GUIDELINE CALCULATION:

In the present case the Pre-Sentence Report writer calculated the matter utilizing the 2021 guideline manual and the presentence report calculates the offense level to be 13.  The Defense agrees with this calculation.

The presentence writer found one criminal history point.  The criminal history point was for a 2013 misdemeanor case of Minor Driving after Drinking.  All of the DUI and DUI related charges were dismissed.  It was not determined if Mr. DiCamillo had representation during this case and the actual facts of this case were not available to the Presentence Report Writer.  Given the above arguments, and under the principal of equity and fairness, this should be a level 13 category I case, making the range 12-18 months prior to any other motions or deviations.  The presentence report writer determined a sentence to the lower end of the range would be appropriate.

## 3553 FACTORS AS APPLIED TO THIS CASE:

The primary directive in § 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" 18 U.S.C. § 3553(a).  Section 3553(a) directs a court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence imposed [considering the factors listed above], (3) the kinds of sentences available, (4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (5) the need to provide restitution to any victims of the offense.

4

**Section 3553(a)(1): The Nature and Circumstances of the Offense and the History and Characteristics of the Offender.**

*Age Per§5H1.1*

Mr. DiCamillo was born on October 12th, 1994.  At the time of the offense committed on August 22nd, 2019, he was twenty-four years of age.  He was still within a window of prefrontal cortex development.  The prefrontal cortex developmental window spans age puberty until approximately age twenty-five and impacts judgment, reasoning, and impulsivity (Aamodt & Wang, 2011).  Under most laws, young people are recognized as adults at age eighteen, but emerging science about brain development suggests that most people don't reach full maturity until the age of twenty-five in those subjects without any additional complications or variables slowing or stunting this development. Sandra Aamodt, neuroscientist and co-author of the book "Welcome to Your Child's Brain" discussed how key "critical parts of the brain involved in decision making are not fully developed until age twenty-five or so". These studies are confirmed through viewing brain scans by age. Dr. Aamodt explains that the changes that happen between eighteen and twenty-five are a continuation of the process that starts around puberty, and eighteen-year-olds are about halfway through that process. Their prefrontal cortex is not yet fully developed. This is of most relevance because that is the part of the brain that helps you to inhibit impulses and to plan and organize your behavior to reach a goal.

The other part of the brain that is different during this period of development is that the brain's reward system becomes highly active right around the time of puberty and then gradually goes back to an adult level and that is what makes adolescents and young adults more interested in

entering uncertain situations.  Dr. Aamodt was interviewed by NPR and her opinions are documented on NPR.org in addition to her in her book. *Reference: Aamodt, S., & Wang, S. (2011). Welcome to your child's brain: How the mind grows from conception to college. New York, N.Y.: Bloomsbury.*

The frontal lobe is the area of the brain that is responsible for higher cognitive functions including problem solving, impulse control, social and sexual behavior, and judgment.  Mr. DiCamillo's age at the time of the incident was within this developmental window. He is now twenty-seven and has matured beyond this developmental window. At this age he passed the age of twenty-five and his pre-frontal cortex has progressed. At this point his decision making and impulse control are greatly improved compared to someone under the age of twenty-five and thus he is lower risk now for future offense.

*Family History, Ties and Responsibilities Per§5H1.6*

Mr. DiCamillo was born in Arizona.  His parents met in a casino while gambling at the same table.  They never married, and his father left the relationship when Mr. DiCamillo was two years old.  He stayed in his son's life, albeit mainly at a distance. His father worked in construction, eventually opening his own small construction company. His mother babysat special needs kids in the community after having Mr. DiCamillo's youngest brother who was a special needs child from birth.

Mr. DiCamillo is one of seven siblings and has four brothers and one sister from his mother's various relationships.  His mother was married three times, in addition to her relationship with Mr. DiCamillo's father and others. His brothers are Dante DeMarco, Mendrick Graham, Samuel Terrel and Nick DiCamillo and his sister is Juliana Marietta. Due to his special needs, Samuel received whatever extra attention Mr. DiCamillo's mother had to

give, out of necessity.  Her time was also further taken attending to other children under her care to earn money.  Mr. DiCamillo was also raised with a maternal cousin as a sibling when his mother took in Mariah Ranniker to raise from her sister who struggled with a severe drug addiction. His mother's primary focus when not minimally caring for a house full of children was spent looking for men and trying to find a lasting relationship.

Mr. DiCamillo described his father as a great participant "when he was available".  They used to go out shooting in the desert.  He owned every type of gun imaginable, from revolvers to semi-automatic weapons. He instilled in Mr. DiCamillo a passion and healthy respect for firearms. Unfortunately, he worked a lot, abused drugs, and lived in a rough part of town where Mr. DiCamillo did not feel comfortable.  His stepmother was an extreme addict who overdosed every few days and despite Mr. DiCamillo not being at their residence often, he had to call 911 to save her life more times than he can count. She would also steal money and cause huge fights within the home environment.

As a result, Mr. DiCamillo's childhood was unstable while transitioning between chaotic households. Sometimes he lived in his mother's home, other times at his father's, and otherwise stayed with his grandparents, an aunt, uncles, and at his oldest brother Dante's residence. He lived with Dante in third through fifth grades until his brother was sent to prison for a drug charge and then again from seventh to ninth grade upon his release. Everyone made sure that he was fed and had a roof over his head, but he had no real support or role models in life except his brother Dante who was in and out of prison. No one cared if he did well in school, had friends, or was socially well adjusted. They barely provided for the basics and the rest was up to him.

Mr. DiCamillo's father died when he was fifteen, completely shattering his world. Despite the difficulties with his stepmother, his father represented the closest thing to stability in his life and he "felt crushed to my core when he passed away".  He lived with a paternal aunt for a year following his father's death until he had to leave while she dealt with divorce. He returned to his brother Dante's to try and rebuild but then his house was raided by the local SWAT team. Mr. DiCamillo had never seen such a show of force and felt panicked as they arrested Dante and sent him to jail.

Mr. DiCamillo had no stability, minimal motivation to learn, no one to stay on top of his studies, and little interest in the classes taught.  He put minimal effort into his education and received grades of mostly Cs because teachers seemed most interested in just passing the students along to the next grade. He also moved from school to school further negatively impacting his ability to socially assimilate and form positive relationships or potential educational mentors.  His educational progression included:

1. Whittier Elementary School, kindergarten (he lived with his mother)

2. Pueblo Elementary School, first through third grades, (he lived with his mother)

3. Wilson Elementary School, fourth and fifth grades (he lived with his brother Dante)

4. Thunder Mountain Middle School, sixth and seventh grade (he lived with his father and stepmother)

5. O.S. Stapley Junior High School, eighth grade (he lived with his grandparents)

6. Red Mountain High School, ninth and tenth grades (his father died while in ninth grade and in tenth grade lived with his aunt)

7. St. Mary's Catholic High School, eleventh grade (he lived with his mother and left after three months because she could not afford the tuition)

8

8.  Saguaro High School, eleventh and twelfth grades (he lived with his brother until SWAT raided his home, and then transitioned back to his mother).

Each school was thirty-to-forty miles apart and consisted of different demographics, so Mr. DiCamillo came to appreciate diversity in a way most young people do not have the opportunity to learn.  However, he had no consistent adult supervision in his life and found it challenging to make friends.  He compensated by being excessively outgoing. Sometimes he got into trouble by going overboard with antics for attention.  He struggled in every other aspect of his life. The constant moving also played a role in his low grades since each school's curriculum varied. So, he constantly lacked a background in certain subjects, which had already been taught at the schools. It additionally kept him from bonding with any teacher who could have played a mentor-like role in my life.

He tried the trumpet and violin in grade school but never found the time to practice. He played Pop Warner football in Junior High School and High School. His stepmother attended one game, as did his brother, but that was about it. He felt so alone and alienated as his teammates would look up to see their entire families in the stands.

Mr. DiCamillo began drinking at the age of twelve. In his family, no one really cared. Most people he knew didn't start drinking until high school. He struggled immensely when his father died and began drinking heavily, sparking his fall into addiction. He received a charge for underage drinking during one of his benders. While his father wasn't always there for him, he at least felt like he was the one person he could count on and now he was gone. He felt so alone. He then lived with his aunt and felt utterly destroyed when he had to leave during her divorce. He turned to the only person he had left, his brother Dante. At seventeen, he was again charged with underage drinking.

9

Mr. DiCamillo spent a great deal of his formative years with his brother Dante. During his life Dante was in and out of prison for selling drugs and this was Mr. DiCamillo's main role model during this time. While Mr. DiCamillo lived with his brother, he saw the lifestyle that his illegal activities provided. He witnessed his brother have a million dollars in cash in his house when he was raided. He saw the nice cars and the Rolex watch. This was his role model in his teens.

When his brother was arrested at Mr. DiCamillo's age of seventeen, he was again on his own and alone. He hustled every way he could to try and survive. There was a time in his early adulthood that he met a girl and got married. He tried the straight and narrow path by selling Amway and Vemma. Unfortunately, Vemma went of business, and he lost a lot of his investment and his income. He ended up getting divorced due to the financial problems. This led him to revert back to what was modeled to him and it led him to do what he did in this case.

The United States Department of Justice (USDOJ) in connection with the Office of Juvenile Justice and Delinquency Prevention (OJJDP, 2000a, 2000b; USDOJ, 1995), along with several affiliated (as well as independent) researchers, has evaluated the relationship between early experiences and moral development. From this large body of literature, it has become clear that moral development and hence moral culpability is shaped or impacted by the interaction of essentially two main areas of experiences: Risk and Protective Factors.

Risk factors are events, circumstances, and/or vulnerabilities that are present in the individual's life, which prevent the adequate development of moral reasoning skills. Of these factors that have been identified empirically to contribute to the lack of moral development, ultimately contributing to poor life choices. Several risk factors were identified

10

to be present in Mr. DiCamillo's history including neglect, abandonment, frequent moves and transitions, living with family members who become incarcerated, death of a parent in adolescence, living with family members with substance abuse problems, and transitioning multiple times between residences and schools. These risk factors impacted Mr. DiCamillo's reduced moral culpability.

*Record of Good Works Per§5H1.11*

The letters submitted on Mr. DiCamillo's behalf from both family and employers and customers of his handyman/concrete company describe him as a caring individual who helped family as well as friends. He was noted to be a self-starter and a hard worker who worked tirelessly to get his new business off the ground. He is described as caring, sensitive, and forgiving to others.

Mr. DiCamillo has a younger brother with special needs named Sam. After his father died, he took over the role as father figure to him. He tried very hard to help him get him jobs and to try to keep him out of trouble. After this incident, he took Sam under his wing and gave him a job in his newly formed concrete company (Hard AZ Rock Concrete, LLC). This has been a key part of Sam's success since he cannot work in many capacities with his disabilities.

**Section 3553(a)(2): The Need for the Sentence Imposed**

The Court, pursuant to 18 U.S.C. § 3553(a)(2)(A)- (D), is required to consider whether the sentence imposed reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. In addition, the Court must consider whether the sentence will "afford adequate deterrence to criminal conduct,", whether it will "protect the public from further crimes of the defendant," and if it affords the Defendant the "needed educational and vocational training, medical care, or other

correctional treatment," while also addressing the Need to Protect the Public from Further Crimes, Need to Provide Just Punishment for the Offense, and Need to Reflect the Seriousness of the Offense. The Defendant's risk can be addressed with counseling and supervision upon release. This addresses the need to protect the public. Mr. DiCamillo spent a month in jail and that had a profound impact on him as is proven by his post offense rehabilitative efforts.

**Section 3553(a)(3): Kind of Sentences Available**

It is clear, in light of *Booker*, that the Sentencing Guidelines are advisory. *Booker*, 543 U.S. at 244; *see* 18 U.S.C. §§ 3551, 3561, and 3571. In this case, there are a number of sentences available including probation that will serve the purposes under the Sentencing Guidelines without being greater than necessary. Given that the Guideline Range is 12-18 months prior to any motions yet to be filed, he is a good candidate for Probation.

*Post Arrest Rehabilitative Efforts*

Post release from federal holding, Mr. DiCamillo knew he needed to make a change, so, he got his first job at DCS Contracting working as a laborer in the concrete division. He became a foreman lead within five days and knew he may have found his calling and he was proud that he was following in his father's footsteps. Shortly after relatives and friends found out he was working in concrete, many asked if he could help with small projects. He was able to get some quality help from DCS and had some success with the small jobs that came his way. After a while, he progressed from DCS and started his own business Hard AZ A Rock Concrete, LLC. Thanks to word of mouth and social media, his business took off. He was in the process of getting his KB1 General contractor's license but that got put on hold due to these charges. He next brought his cousin Bridget DiCamillo on as a partner, and she took the Contractors Exam so the firm can be a licensed construction

company. The success he has had through sheer determination and perseverance, has shown him that he can make good money in a legitimate way.  Mr. DiCamillo works twelve hours a day seven days a week to build this company.  Laying concrete is hard physical work. During sentencing you will see the calluses on his hands.

He is not doing this just for himself but also for his brother Sam.  He doesn't know what the future holds, but once this is behind him, he can be a law-abiding citizen and the good role model he never had to his little brother.  Mr. DiCamillo has a bright future that doesn't involve breaking the law.

Mr. DiCamillo also worked on getting his alcohol addiction under control. He began seeing a local priest searching for spiritual guidance and attending Alcoholics Anonymous.  He is clearly on the right path.  Probation can be a great help in providing him the supervision and resources he needs to be successful moving forward to continue to build on this foundation he began building.

### *DEFENDANT DICAMILLO SENTENCING RECOMMENDATION*

The Defendant is requesting that the Court sentence him to Probation and time served. Mr. DiCamillo had a rough childhood.  His only real influence in life after his dad died was his brother Dante, who was engaged in illegal activity.  He started down the same path as his brother, but now has a chance to make something of his life. We are simply asking that Mr. DiCamillo be given probation so that he and Sam can continue pouring concrete and living a productive life.  This sentence complies with the statutory directives set forth in 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED this 2nd day of October, 2022.

CATES & GARVEY, PLC


                    /s/ Dwane Cates
Dwane Cates
7310 N. 16th Street., Suite 330A
Phoenix, AZ 85020
Attorney for Defendant

///

///

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY on October 2, 2022, I electronically transmitted the foregoing Defendant's Sentencing Memorandum to the Clerk of the Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing will be e-mailed thru the CM/ECF System to all counsel of record.


By____/s/ Dwane Cates

14